[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-10322

_____

D.C. Docket No. 6:11-cv-01473-MSS-DAB

LUIS W. LEBRON,
Individually and as Class Representative,

Plaintiff - Appellee,

versus

SECRETARY OF THE FLORIDA DEPARTMENT OF CHILDREN AND
FAMILIES,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(December 3, 2014)

Before HULL and MARCUS, Circuit Judges, and TOTENBERG,* District Judge.

MARCUS, Circuit Judge:

    A Florida statute mandates suspicionless drug testing of all applicants

_____

* Honorable Amy Totenberg, United States District Judge for the Northern District of Georgia,
sitting by designation.

seeking Temporary Assistance for Needy Families ("TANF") benefits.  See Fla. Stat. § 414.0652.  Luis Lebron sued the Secretary of the Florida Department of Children and Families (the "State"), claiming that the statute violates the Fourth Amendment's prohibition against unreasonable searches and seizures, applied against the states through the Fourteenth Amendment.  After we affirmed the entry of a preliminary injunction barring the application of the statute against Lebron, the State halted the drug-testing program.  See Lebron v. Sec'y, Fla. Dep't of Children & Families (Lebron I), 710 F.3d 1202 (11th Cir. 2013).  Since then, the district court granted final summary judgment to Lebron, declared § 414.0652 unconstitutional, and permanently enjoined its enforcement.

We affirm.  On this record, the State has failed to meet its burden of establishing a substantial special need to drug test all TANF applicants without any suspicion.  Even viewing the facts in the light most favorable to the nonmoving party, the State has not demonstrated a more prevalent, unique, or different drug problem among TANF applicants than in the general population.  The ordinary government interests claimed in this case are nothing like the narrow category of special needs that justify blanket drug testing of railroad workers, certain federal Customs employees involved in drug interdiction or who carry firearms, or students who participate in extracurricular activities because those programs involve "surpassing safety interests," Skinner v. Railway Labor Execs. Ass'n, 489

2

U.S. 602, 634 (1989), or "close supervision of school children," Vernonia Sch.

Dist. 47J v. Acton, 515 U.S. 646, 655 (1995) (quoting New Jersey v. T.L.O., 469

U.S. 325, 339 (1985)).

Moreover, as we held in Lebron I, the State cannot circumvent constitutional

concerns by requiring that applicants consent to a drug test to receive TANF

payments. When a government benefit is conditioned on suspicionless drug

testing, the voluntariness of the program is properly viewed as a factor baked into

the special needs reasonableness analysis, not as an exception to it.

## I.

## A.

Congress created TANF in the Personal Responsibility and Work

Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105.

TANF provides federal block grants for state programs "that provide[] assistance

to needy families with (or expecting) children and provide[] parents with job

preparation, work, and support services to enable them to leave the program and

become self-sufficient." 42 U.S.C. § 602(a)(1)(A)(i). Florida began disbursing

TANF benefits, including Temporary Cash Assistance, to families in 1996 through

its Department of Children and Families ("DCF" or the "Department"). To apply

for TANF benefits in Florida, an individual must complete an application and must

satisfy a number of eligibility requirements. Fla. Stat. § 414.095. Only expectant

mothers and families with children qualify.  Id. § 414.095(14)(a).  In the application, an individual must disclose certain information, including medical history, immunization records, living arrangements, social security numbers, family income, employment history, and job-search activities.  For families of two like Lebron and his son, the maximum Temporary Cash Assistance benefit currently is $241.00 per month.  Id. § 414.095(10)(c).  An individual generally may not receive TANF Temporary Cash Assistance for more than a lifetime cumulative total of 48 months.  Id. § 414.105.

Congress specified in the 1996 Act that states were not prohibited "from testing welfare recipients for use of controlled substances nor from sanctioning welfare recipients who test positive for use of controlled substances."  21 U.S.C. § 862b.  In 2011, Florida enacted a statute requiring suspicionless drug screening for all TANF applicants as a condition of eligibility.  Fla. Stat. § 414.0652.  Under that law, applicants must provide a DCF-approved laboratory with a urine sample to be tested for Amphetamines, Methamphetamines, Cannabinoids (THC), Cocaine, Phencyclidine (PCP), Opiates, Barbiturates, Benzodiazepines, Methadone, and Propoxyphene.  The statute does not require testing for alcohol.  DCF must "[a]dvise each individual to be tested, before the test is conducted, that he or she may, but is not required to, advise the agent administering the test of any prescription or over-the-counter medication he or she is taking."  Id.

4

§ 414.0652(2)(d).  Applicants bear the cost of testing, which during the period of the statute's implementation generally ranged between $24 and $45.  However, if an applicant tests negative for controlled substances, the Department increases the amount of TANF benefit to compensate for the testing expense.  Id. § 414.0652(2)(a).  State law provides that "[a] sample shall be collected with due regard to the privacy of the individual providing the sample, and in a manner reasonably calculated to prevent substitution or contamination of the sample."  Id. § 112.0455(8)(a).[1]  Notably, an applicant may arrange the timing of filing an application; after the State determines that the applicant has satisfied all non-drug testing eligibility factors (e.g., income, assets, etc.), the applicant must pass a drug test within ten days.

Under § 414.0652, an individual who tests positive for controlled substances is ineligible for TANF benefits for one year, though those who fail drug tests may reapply for benefits after six months if they can document successful completion of a substance abuse treatment program and pass another drug test.  Id.

---

[1] State regulations further require "minimum precautions" to ensure the security of the urine specimen: "[t]he collection site person shall ask the individual to remove any unnecessary outer garments, such as a coat or jacket, and to empty all clothing pockets. . . .  The individual may retain his or her wallet, provided that the collection site person shall check it for possible contaminants."  Fla. Admin. Code r. 59A-24.005(3)(c)(5).  "The individual may provide his or her urine specimen in a stall or otherwise partitioned enclosure that allows for individual privacy. The collection site person shall remain in the restroom or area, but outside the stall or partitioned enclosure."  Id. r. 59A-24.005(3)(c)(7).  In addition, if "a collection site person has reason to believe that a particular individual may alter or has altered or substituted a urine specimen," and a higher level supervisor agrees, a second specimen shall be collected "under the direct observation of an observer of the same gender as the donor."  Id. r. 59A-24.005(3)(c)(13).

5

§§ 414.0652(1)(b), (2)(j).  A parent cannot receive benefits without passing a drug test, but the parent's failure of a test does not affect a child's eligibility to receive TANF benefits; instead, a protective payee would be designated to receive benefits for the child.  Id. § 414.0652(3).

The § 414.0652 drug-testing requirement went into effect on July 1, 2011, and was enforced until the district court entered a preliminary injunction on October 24, 2011.  During that period, 4,046 TANF applicants submitted to drug testing.  Only 108 -- 2.67% -- tested positive for drug use: 44 for cannabinoids (marijuana); 24 for benzodiazepines (e.g., Xanax); 10 for cocaine; 9 each for barbiturates and opiates; 10 for methadone; 3 for propoxyphene; 5 for amphetamines or methamphetamines; and 2 for PCP.[2]  Throughout that period, 2,306 additional applicants did not complete applications and submit drug-test results to DCF, even though they were otherwise eligible for TANF Temporary Cash Assistance.

When he brought suit, Lebron had sole custody of his five-year-old son.  A veteran of the United States Navy and a college student, Lebron was a thirty-five-year-old single-parent who lived with and cared for his disabled mother in Orlando, Florida.  On July 16, 2011, Lebron applied to DCF for TANF benefits for himself and his son.  Lebron initially signed a form agreeing to drug testing, but he

---

[2] Some applicants tested positive for more than one drug.

6

later revoked his consent and refused to take the test.  If Lebron had passed a drug test and submitted the results, the Department determined, he and his son would have been eligible for TANF benefits.  Without the test, however, the Department deemed him ineligible to receive TANF assistance and denied his application on August 25, 2011.

## B.

On behalf of himself and a class of similarly situated persons, Lebron commenced this lawsuit in the United States District Court for the Middle District of Florida on September 6, 2011, against the Secretary of DCF in his official capacity.  Lebron sought a declaration that requiring suspicionless drug testing for TANF eligibility under § 414.0652 violated the Fourth Amendment right to be free from unreasonable searches.  Lebron also asked for a permanent injunction barring the enforcement of § 414.0652.  Lebron filed a motion for a preliminary injunction with his complaint.

On October 24, 2011, the district court preliminarily enjoined the State from requiring that Lebron submit to a suspicionless drug test pursuant to § 414.0652 as a condition for receiving TANF benefits until the case was resolved.  Lebron v. Wilkins, 820 F. Supp. 2d 1273, 1293 (M.D. Fla. 2011).  The court found that Lebron was substantially likely to succeed on the merits of his challenge, that he would suffer irreparable injury without an injunction, that his threatened injury

7

outweighed the possible injury to the State, and that an injunction would not disserve the public interest. See id. at 1281 (citing Horton v. City of St. Augustine, Fla., 272 F.3d 1318, 1326 (11th Cir. 2001)). Because the State stipulated that it would apply the ruling to all similarly situated persons, the district court initially denied without prejudice Lebron's motion for class certification. Shortly thereafter, though, out of concern that Lebron's individual claim might become moot during the litigation, the district court certified a class of Florida TANF applicants.[3] In response to the preliminary injunction, DCF suspended the § 414.0652 TANF drug-testing program statewide, approved all applications that had been pending based on drug testing, approved benefits for individuals who had tested positive, and reimbursed TANF applicants for drug tests to the extent they had not already received reimbursement. In total, the Department restored TANF Temporary Cash Assistance to approximately 1,727 families.

The Secretary appealed the preliminary injunction, and a panel of this Court affirmed. Lebron I, 710 F.3d 1202. We found it undisputed that government-mandated drug testing is a Fourth Amendment "search." Id. at 1206. The Court

---

[3] The certified class is composed of:

> All persons residing in Florida who applied for, are applying for, or will in the future apply for, Temporary Cash Assistance ("TCA"), Florida's program to distribute Temporary Assistance for Needy Families ("TANF") benefits, and who would, absent [the preliminary injunction], be subject to Defendant's mandatory suspicionless drug testing as a result of Fla. Stat. § 414.0652.

8

explained that, to qualify as a constitutionally reasonable search, § 414.0652 drug testing either must be based on individualized suspicion of wrongdoing, or must involve certain limited and exceptional circumstances, when the government shows substantial "special needs." Id. at 1206-07 (quoting Skinner, 489 U.S. at 619). Because this case did not involve either of the two exceptional circumstances recognized by the Supreme Court -- employees engaged in inherently dangerous jobs (such as railroad workers or federal Customs employees who are involved in drug interdiction or who carry firearms) and children in public schools -- we concluded that the district court did not abuse its discretion in determining that the State failed to establish a substantial special need justifying its TANF drug-testing requirement. The State's claimed special need -- ensuring that the goals of TANF are not jeopardized by drug use -- rested on a presumption of an unlawful drug-use problem among Florida TANF recipients that the State had failed to support with concrete facts. Id. at 1212-13. The Court also rejected the State's alternative claim that § 414.0652 drug testing was constitutionally permissible because TANF applicants gave their consent, citing "the Supreme Court's long-standing admonition that the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected interests.'" Id. at 1217 (quoting Perry v. Sindermann, 408 U.S. 593, 597 (1972)). Ultimately, the Court held that the district court did not abuse its discretion in rejecting the State's

9

consent argument due to the unconstitutional conditions doctrine. Id. at 1218. The State petitioned for rehearing en banc, which the Court denied.

Meanwhile, the State had not sought a stay of the matter in the district court pending appeal, and both parties filed motions for summary judgment before we decided Lebron I. After we issued our opinion in the preliminary injunction matter, and after the completion of discovery, the district court entered an order granting final summary judgment in favor of Lebron and denying the State's motion. Lebron v. Wilkins, 990 F. Supp. 2d 1280 (M.D. Fla. 2012). The State argued in the district court that drug testing was constitutionally permissible because of three "special needs": "(1) ensuring TANF participants' job readiness; (2) ensuring the TANF program meets its child-welfare and family-stability goals; and (3) ensuring that public funds are used for their intended purposes and not to undermine public health." Id. at 1291-92. Citing Lebron I, the district court concluded, however, that the State failed to show that TANF recipients fell within the "closely guarded category" for whom the Supreme Court has allowed suspicionless drug testing, and also failed to demonstrate that the statute was necessary to protect children because the TANF testing has no impact on the familial and custodial relationships of applicants. Id.

Significantly, the district court also found that the only competent record evidence addressing drug use among the Florida TANF population came from a

10

1998 study conducted by DCF that actually found a lower rate of drug usage among TANF applicants than among current estimates of the population of Florida as a whole. Id. at 1293. The court deemed inadmissible or irrelevant other evidence proffered by the State concerning the rate of drug use among Florida's TANF population. The district court concluded that "there simply is no competent evidence offered on this record of the sort of pervasive drug problem the State envisioned in the promulgation of this statute." Id. at 1298. Finally, the court rejected the state's consent argument, finding that consent under the statute was not voluntarily given. Id. Ultimately, because there was no set of circumstances under which § 414.0652 could be applied constitutionally, the court declared the statute facially unconstitutional and permanently enjoined the State from enforcing it. Id. at 1299. The State filed a timely notice of appeal of the district court's final order, which we have jurisdiction to review under 28 U.S.C. § 1291.

## II.

We review the district court's grant of summary judgment in favor of Lebron de novo, viewing all facts in the light most favorable to the State. Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott (AFSCME), 717 F.3d 851, 862 (11th Cir. 2013). We review evidentiary rulings, including the exclusion of evidence at summary judgment, for abuse of discretion. See Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999). Thus, we defer to the district

11

court's ruling unless it is "manifestly erroneous": "Because the task of evaluating the reliability of expert testimony is uniquely entrusted to the district court . . . we give the district court 'considerable leeway' in the execution of its duty." Hendrix ex rel. G.P. v. Evenflo Co., 609 F.3d 1183, 1191 (11th Cir. 2010) (quoting Rink v. Cheminova, 400 F.3d 1286, 1291 (11th Cir. 2005)). Similarly, "[t]he ultimate decision as to the admissibility of lay opinion testimony is committed to the sound discretion of the district court and will not be overturned on appeal unless there is clear abuse of discretion." United States v. Myers, 972 F.2d 1566, 1576-77 (11th Cir. 1992). "Evidence inadmissible at trial cannot be used to avoid summary judgment." Chapman v. Procter & Gamble Distrib., LLC, 766 F.3d 1296, 1313 (11th Cir. 2014) (quoting Corwin v. Walt Disney Co., 475 F.3d 1239, 1249 (11th Cir. 2007)).

Under the "law of the case" doctrine, the "findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal." Heathcoat v. Potts, 905 F.2d 367, 370 (11th Cir. 1990) (per curiam) (quoting Westbrook v. Zant, 743 F.2d 764, 768 (11th Cir. 1984)). This doctrine is limited to issues actually decided by the appellate court, and discussion in dicta "is neither the law of the case nor binding precedent." Great Lakes Dredge & Dock Co. v. Tanker Robert Watt Miller, 957 F.2d 1575, 1578 (11th Cir. 1992). Still, law of the case includes "things decided

12

by necessary implication as well as those decided explicitly." Wheeler v. City of Pleasant Grove, 746 F.2d 1437, 1440 (11th Cir. 1984) (per curiam) (quoting Dickinson v. Auto Ctr. Mfg. Co., 733 F.2d 1092, 1098 (5th Cir. 1983)).  Our precedent recognizes three exceptions to the law of the case doctrine: "when (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to that issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." Id. (quoting United States v. Robinson, 690 F.2d 869, 872 (11th Cir. 1982)).  We enforce this judge-made doctrine in the interests of efficiency, finality and consistency: "[f]ailure to honor its commands can only result in chaos." Litman v. Mass. Mut. Life Ins. Co., 825 F.2d 1506, 1511 (11th Cir. 1987) (en banc).

In Lebron I, we reviewed the grant of a preliminary injunction on an undeveloped record and asked only whether the district court had abused its discretion in determining that Lebron was likely to succeed on the merits of his claim. See 710 F.3d at 1206.  The Court was not asked, and did not decide, the ultimate constitutionality of § 414.0652. See id. at 1218 (Jordan, J., concurring). Still, in reaching its decision, Lebron I noted a number of legal principles that apply equally to the issues presently before us.

### III.

"The right of the people to be secure in their persons, houses, papers, and

13

effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. The drug testing by urinalysis required under § 414.0652 is undisputedly a Fourth Amendment search. Skinner, 489 U.S. at 617 ("Because it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable, . . . these intrusions must be deemed searches under the Fourth Amendment."). The question is whether mandatory, suspicionless drug testing of all TANF applicants amounts to a reasonable search. While the Constitution generally prohibits government searches conducted without individualized suspicion, the Supreme Court has recognized exceptions in certain well-defined circumstances, including when the government has "special needs, beyond the normal need for law enforcement." Chandler v. Miller, 520 U.S. 305, 313 (1997) (quoting Skinner, 489 U.S. at 619). The Secretary argues that the State has a "special need" for its drug-testing regime and, alternatively, that consent from TANF applicants renders the searches constitutionally valid. We are unpersuaded.

## A.

The special needs doctrine recognizes that, "[i]n limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable

14

despite the absence of such suspicion." Skinner, 489 U.S. at 624. In determining whether the State possesses a sufficiently substantial special need, "courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." Chandler, 520 U.S. at 314. The Supreme Court has permitted suspicionless drug testing only "where the asserted special need addresses a substantial concern for public safety or where the state is fulfilling its well-recognized role as the guardian and tutor of public school children." Lebron I, 710 F.3d at 1210.

In Skinner, federal regulations required blood and urine testing of railroad employees involved in train accidents, and also allowed railroads to conduct breath and urine tests of employees who violated safety rules. The regulations were adopted in response to evidence of drug and alcohol abuse by some rail employees, the enormous safety hazards posed by such abuse, and the documented link between impaired employees and train accidents. The Supreme Court upheld the testing program as justified by "surpassing safety interests" because drug testing could deter rail workers who might "cause great human loss before any signs of impairment become noticeable to supervisors." Skinner, 489 U.S. at 634, 628. The program also allowed railroads to collect critical information about the causes of major train accidents. Suspicionless testing was necessary, according to the Court, because blanket searches after (unpredictable) accidents prevented

employees from avoiding detection by planning drug use around a testing schedule, and because waiting to establish suspicion about individuals after an accident "likely would result in the loss or deterioration of the evidence furnished by the tests." Id. at 631.

For similar reasons, the Supreme Court upheld drug testing of United States Customs Service employees who were directly involved in drug interdiction or were required to carry firearms. See Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656 (1989). Noting that the program was intended "to deter drug use among those eligible for promotion to sensitive positions within the Service and to prevent the promotion of drug users to those positions," the Court concluded that a substantial special need justified the search. Id. at 666. Considering the hazardous and important work done by Customs employees, particularly their exposure to threats, bribes, and blackmail from drug traffickers, the Court held that "the Government has a compelling interest in ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment." Id. at 670. Similarly, employees "who may use deadly force plainly discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." Id. (internal quotation marks omitted). "In light of the extraordinary safety and national security hazards that would attend the promotion of drug users to positions that require the carrying of firearms or the

16

interdiction of controlled substances, the Service's policy of deterring drug users from seeking such promotions cannot be deemed unreasonable." Id. at 674.

Outside the context of employees in especially hazardous occupations, the Supreme Court has recognized only one other circumstance giving rise to a substantial special need that justifies suspicionless drug testing: when testing "was undertaken in furtherance of the government's responsibilities, under a public school system, as guardian and tutor of children entrusted to its care." Vernonia, 515 U.S. at 665.  The Vernonia Court upheld a school board policy that required public school students to consent to suspicionless drug testing in order to participate in athletics.  The Supreme Court highlighted the peculiar circumstances of public schools, where "[a] proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult." Id. at 655 (quoting T.L.O., 469 U.S. at 339).  As a result, "Fourth Amendment rights . . . are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children." Id. at 656.  The Supreme Court found that the school board had an important interest in deterring drug use among student athletes because they are at an age "when the physical, psychological, and addictive effects of drugs are most severe," because "the effects of a drug-infested school are visited . . . upon the entire student body and faculty,

17

as the educational process is disrupted," and because, with school athletics, "the risk of immediate physical harm to the drug user or those with whom he is playing his sport is particularly high." Id. at 661-62. The Court concluded that "a drug problem largely fueled by the 'role model' effect of athletes' drug use, and of particular danger to athletes, is effectively addressed by making sure that athletes do not use drugs." Id. at 663.

On the other side of the scale, the Supreme Court found that student athletes had lower expectations of privacy because their activities typically involved dressing and showering in public locker rooms and submitting to mandatory preseason physical exams, as well as complying with other eligibility requirements. Id. at 657. "Somewhat like adults who choose to participate in a 'closely regulated industry,' students who voluntarily participate in school athletics have reason to expect intrusions upon normal rights and privileges, including privacy." Id. Measured against the school board's substantial need, the Court held that the invasion of privacy was not significant, and therefore that the "[p]olicy is reasonable and hence constitutional." Id. at 665. Notably, however, the Court "caution[ed] against the assumption that suspicionless drug testing will readily pass constitutional muster in other contexts." Id.

After Vernonia, the Supreme Court also upheld a policy requiring drug tests for all public middle and high school students who participated in competitive

18

extracurricular activities, including athletics but also the Academic Team, Future Farmers of America, band, choir, and cheerleading.  See Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 826 (2002).  The Supreme Court interpreted Vernonia as "depend[ing] primarily upon the school's custodial responsibility and authority," id. at 831, and explained that "[t]he health and safety risks identified in Vernonia apply with equal force" to the population of school children in Earls, particularly because the school district "presented specific evidence of drug use at [its] schools."  Id. at 834.  "Given the nationwide epidemic of drug use, and the evidence of increased drug use in Tecumseh schools, it was entirely reasonable for the School District to enact this particular drug testing policy."  Id. at 836.  Still, the Court "refuse[d] to fashion what would in effect be a constitutional quantum of drug use necessary to show a 'drug problem,'" explaining that it "has not required a particularized or pervasive drug problem before allowing the government to conduct suspicionless drug testing" when circumstances otherwise create a necessarily immediate danger.  Id. at 835-36.

By contrast, in Chandler the Supreme Court refused to recognize a special need justifying Georgia's mandatory drug testing of candidates for designated state offices because the program did "not fit within the closely guarded category of constitutionally permissible suspicionless searches."  520 U.S. at 309.  Georgia claimed that suspicionless testing was justified by "the incompatibility of unlawful

19

drug use with holding high state office," particularly because "the use of illegal drugs draws into question an official's judgment and integrity; jeopardizes the discharge of public functions, including antidrug law enforcement efforts; and undermines public confidence and trust in elected officials." Id. at 318.  The Supreme Court found no "indication of a concrete danger demanding departure from the Fourth Amendment's main rule." Id. at 319.  Unlike in Skinner and Vernonia, the Georgia "statute was not enacted . . . in response to any fear or suspicion of drug use by state officials." Id.  In addition, the scheme was not a credible deterrent of illegal drug use because candidates could schedule their own tests, which allowed them to time their drug use to avoid detection, and candidates for public office already "are subject to relentless scrutiny." Id. at 320-21.  The Supreme Court saw no significance to the message the State sought to send by testing politicians: "The need revealed . . . is symbolic, not 'special,' as that term draws meaning from our case law." Id. at 322; see id. ("[I]f a need of the 'set a good example' genre were sufficient to overwhelm a Fourth Amendment objection, then the care this Court took to explain why the needs in Skinner, Von Raab, and Vernonia ranked as 'special' wasted many words in entirely unnecessary, perhaps even misleading, elaborations.").

These precedents establish and enforce the principle that "the proffered special need for drug testing must be substantial -- important enough to override

the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." Id. at 318. With that in mind, we turn to the application of the doctrine in this case. In the special needs balancing calculus, "[t]he first factor to be considered is the nature of the privacy interest upon which the search here at issue intrudes." Vernonia, 515 U.S. at 654. However, as we explained in Lebron I, we need not weigh competing individual and governmental interests unless the State satisfies its burden of establishing a special need for its suspicionless drug-testing program. 710 F.3d at 1214 (citing T.L.O., 469 U.S. at 351 (Blackmun, J., concurring in judgment)); see Chandler, 520 U.S. at 318 (declaring a suspicionless drug-testing program unreasonable when the state failed to show a substantial need, even though "if the 'special needs' showing had been made, the State could not be faulted for excessive intrusion"). The State argues that, by seeking TANF benefits, applicants voluntarily subject themselves to heightened regulation, and thus have limited legitimate expectations of privacy. Cf. Vernonia, 515 U.S. at 657 ("By choosing to 'go out for the team,' [student-athletes] voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally."); Von Raab, 489 U.S. at 671 ("[T]hose who join our military or intelligence services . . . may expect intrusive inquiries into their physical fitness . . . .").

Of course, citizens do not abandon all hope of privacy by applying for

21

government assistance.  By virtue of poverty, TANF applicants are not stripped of their legitimate expectations of privacy -- they are not employees in dangerous vocations or students subject to the parens patriae power of the state.  And "the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable."  Skinner, 489 U.S. at 617.  But even if TANF applicants had reduced expectations of privacy -- and the record supports no such inference -- the State first must demonstrate a substantial special need.

On this record the State has failed to meet its burden on the "core issue" of whether a special need justifies suspicionless searches of TANF applicants. Chandler, 520 U.S. at 318.  The State argues that the following interests -- the same ones it invoked in Lebron I -- qualify as special needs sufficient to permit mandatory drug testing of TANF applicants: "(1) ensuring TANF participants' job readiness; (2) ensuring the TANF program meets its child-welfare and family-stability goals; and (3) ensuring that public funds are used for their intended purposes and not to undermine public health."  Lebron, 990 F. Supp. 2d at 1291. Encouraging employability, protecting children, and conserving public funds are general -- and unquestionably legitimate -- public concerns.  But empirical evidence indicates these needs are not specific to or special for TANF applicants, nor is drug testing essential to ensuring the success of the TANF program as a whole.  The government's stated needs are general concerns, proffered only at a

22

high level of abstraction and without empirical evidence, and thus do not justify an exception to the Fourth Amendment. The State claims, nevertheless, an interest in preparing TANF applicants for the workplace. But government generally wants its citizens to be able to find and keep jobs -- the State does not desire work-readiness only for the TANF population. Similarly, while it claims an interest in protecting children from drug use by TANF parents, the State has presented no evidence that children of TANF parents face a danger or harm from drug use that is different from the general threat to all children in all families. After all, the State acknowledges that drug use harms all individuals and families, but the State does not -- and cannot -- claim an entitlement to drug test all parents of all children.

Nor do we see a special need from the State's desire that government funds are spent wisely. An interest in fiscal responsibility inheres in all public programs, and the interest is real. See Lebron I, 710 F.3d at 1220-21 (Jordan, J., concurring) ("Every expenditure of state dollars, taxpayers hope, is for the purpose of achieving a desirable social goal. But that does not mean that a state is entitled to require warrantless and suspicionless drug testing of all recipients of state funds (e.g., college students receiving Bright Futures scholarships, see Fla. Stat. § 1009.53) to ensure that those funds are not being misused and that policy goals (e.g., the graduation of such students) are being achieved."). "[T]he nature and immediacy of the governmental concern at issue here" is ordinary, not exceptional.

23

Vernonia, 515 U.S. at 660; cf. AFSCME, 717 F.3d at 876 ("The State's abstract reasons do not fit within the narrow scope that the Supreme Court has given to the special-needs exception . . . . [I]f those reasons could suffice, then there would never be any need to balance anything . . . ."). The State has presented no evidence demonstrating that drug testing saves a significant portion of TANF funds that would otherwise be spent on drugs. Indeed, the State has made no attempt to quantify even in a general way the amount of TANF money that is otherwise wasted on the purchase or use of drugs. Nor could it do so on the record that was presented to the district court. A government concern that a wholly undefined, albeit a very small, share of a program's expenditures will be squandered cannot easily fit within the closely guarded category reserved for substantial special needs without exploding that carefully cultivated doctrine.

We do not foreclose (nor could we) the possibility that government could establish a special need if a voluntary benefits program as a whole would be rendered ineffective without suspicionless searches. In the area of unconstitutional conditions, courts have considered the germaneness of an incursion on constitutional rights to the government's legitimate objectives. See, e.g., Dolan v. City of Tigard, 512 U.S. 374, 386 (1994) (requiring that courts determine whether an "essential nexus" exists between the "legitimate state interest" and the condition imposed by the government). A similar germaneness analysis might justify a

24

special need for suspicionless drug testing when essential to the implementation of a voluntary government benefits program. Thus, for example, if the government sponsored experimental pharmaceutical trials, it might have a unique concern in drug testing participants to ensure drug interactions did not compromise the results or endanger participants. Similarly, if a state provided a free drug treatment program, it might have a special need to test participants to monitor progress and tailor treatment. In this case, and on this record, however, suspicionless drug testing of all TANF applicants comes nowhere near meeting this standard -- the State has not demonstrated that the TANF program as a whole has been compromised without suspicionless searches. Quite simply, we see no essential nexus between the legitimate state interest and the condition imposed. Put differently, the fit is not reasonably proportionated to the harms the State seeks to avoid.

The State argues, nevertheless, that its broadly applicable interests are special because drug use concerns are particularly strong for TANF applicants, but it has not presented a persuasive theoretical or empirical account of a unique problem among TANF applicants. First, no concrete danger exists as a theoretical matter: we have no reason to think impoverished individuals are necessarily and inherently prone to drug use, or, for that matter, are more prone to drug use than the general population. Nor does the State give a reason to think that, if TANF

25

applicants use drugs, that use is somehow different from drug use by the general population. Without an obvious and palpable danger, the State makes an empirical claim that a drug-use problem exists among Florida TANF applicants. "While '[a] demonstrated problem of drug abuse, [is] not in all cases necessary to the validity of a testing regime,' such evidence could 'clarify' and 'substantiate' the dangers presented by such drug use and whether those dangers were pertinent to the government's asserted special need for drug testing." Lebron I, 710 F.3d at 1212 (alterations in original) (quoting Chandler, 520 U.S. at 319). Notably, however, the district court found an absence of any showing of pervasive drug use among the Florida TANF population on the summary judgment record: "Even considering the State's evidence presented to date, the Court finds that there is no material dispute concerning whether drug use has been shown to be a 'demonstrated problem' among Florida TANF recipients." Lebron, 990 F. Supp. 2d at 1293.

Viewing all of the facts in the light most favorable to the State, we agree with the district court that the State has failed to establish a demonstrable or peculiar drug-use problem among TANF applicants. If anything, the evidence extant suggests quite the opposite: that rates of drug use in the TANF population are no greater than for those who receive other government benefits, or even for the general public. As we detail below, the evidence in the summary judgment record does not empirically demonstrate a TANF population drug-use problem.

26

1.

Well before § 414.0652 was enacted, the State's own DCF, at the direction of the Florida legislature, conducted a study -- dubbed the Demonstration Project -- to test empirically whether TANF applicants were likely to abuse illegal drugs and whether that abuse affected employment opportunities.  The study was conducted between January 1, 1999, through May 31, 2000, in select regions of the state by Dr. Robert E. Crew, a professor at Florida State University.  The Demonstration Project first gave TANF applicants a written screening instrument to determine the probability that they abused drugs or alcohol.[4]  Based on the screening, any applicant that the DCF had reasonable cause to believe engaged in the use of illegal drugs was required to take a urine test.  Applicants who failed the urine test were required to undergo treatment to receive benefits.  In total, the Demonstration Project initially screened 8,797 individuals.  Of those, 2,335 did not complete the application process, which the study concluded was "in line with the historical data on 'non-application completers.'"  The researchers rejected the notion that many of these drop-outs were drug users deterred by the testing and treatment requirements, because those who passed and those who failed at each stage of drug-use assessment dropped out at about the same rate.  Of the 6,462 applicants who went

---

[4] The Demonstration Project used the Substance Abuse Subtle Screening Inventory, or SASSI, which was developed by psychologist Glen A. Miller in 1977 to differentiate between substance abusers and non-abusers, regardless of the test subject's denial or deliberate deception.

through the initial screening procedure and followed through with their applicants, 1,447 were required to submit to urinalysis -- the remaining 76.6% demonstrated little or no evidence of a substance abuse problem based on the written screening. From the population that underwent the urinalysis testing, 335 failed. Ultimately, then, the study revealed that only 5.2% of those who completed their TANF applications tested positive for illegal use of a controlled substance (335 out of 6,462). Notably, the researchers also found no evidence that TANF recipients who tested positive for illicit substances were any less likely to find work than those who tested negative.

Data collected during the brief implementation of § 414.0652 suspicionless drug testing was altogether consistent with the Demonstration Project results. Preliminary numbers showed that only 2.67% of the TANF applicants who submitted to urinalyses under § 414.0652 tested positive for controlled substances -- 108 out of 4,046. Lebron, 990 F. Supp. 2d at 1286. The State argues that this number is artificially depressed because thousands of eligible TANF applicants failed to take the test and complete their application. As the district court pointed out, however, the State offers no way to tell how many incomplete applications came from drug users, and how many instead were cut short because applicants were deterred by other factors, including: the desire not to surrender Fourth Amendment rights; the inability to afford the test; or the difficulty finding a nearby

28

testing location or securing transportation.  Id. at 1294.  And, as the Demonstration Project noted, historically a high number of applicants fail to complete their TANF applications, with or without a drug test requirement.  The long and the short of it is that the district court fairly concluded on this record that the number of TANF applicants to test positive for illegal drugs during the brief operation of the program can only support the Demonstration Project findings of low rates of drug use.  Whatever else can be said about these figures, they do not help the State meet its heavy burden of demonstrating a substantial special need.

2.

The district court found that no other competent evidence in the record showed elevated rates of drug use among the Florida TANF population.  After careful review, we agree.  The State points to testimony from expert and lay witnesses that the district court determined either would have been inadmissible at trial or irrelevant to the prevalence of drug usage among TANF applicants.  The district court committed no manifest error with these rulings.

To begin with, the district court did not abuse its considerable discretion in refusing to consider the expert testimony of Dr. Avram Mack.  "[T]he deference that is the hallmark of abuse-of-discretion review requires that we not reverse an evidentiary decision of a district court unless the ruling is manifestly erroneous."  United States v. Frazier, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc) (quoting

Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142, 143 (1997)) (internal quotation marks and citations omitted). Thus, the district court's discretion is broad: "the abuse of discretion standard allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment." Id. at 1259 (quoting Rasbury v. I.R.S., 24 F.3d 159, 168 (11th Cir. 1994)) (internal quotation marks omitted); see Joiner, 522 U.S. at 143 ("On a motion for summary judgment, disputed issues of fact are resolved against the moving party -- here, petitioners. But the question of admissibility of expert testimony is not such an issue of fact, and is reviewable under the abuse-of-discretion standard.").

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Thus, before permitting expert testimony, trial courts must engage in a rigorous three-part inquiry, asking whether:

30

(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert[v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)]; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Frazier, 387 F.3d at 1260 (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)).  As the proponent of the expert, plainly the State bears the burden of establishing qualification, reliability, and helpfulness.  Id.

Before the district court, the State proffered expert testimony from Dr. Mack, a practicing psychiatrist and professor of clinical psychiatry at Georgetown University School of Medicine who practiced and taught in Washington, D.C., in a range of psychiatric and medical fields, including in the areas of drug use and related disorders.  In a declaration and an expert report, Dr. Mack opined about the general detrimental effects of drug use on individuals, their families, and job performance, and also opined that drug use among TANF applicants and recipients is greater than among the general population.  Specifically, Dr. Mack said in a declaration that, based on his expertise and study, it was his opinion that within the TANF population at least five percent of adults had a drug use disorder (compared with two percent in the general population) and twenty percent had used drugs within the past year (against approximately five percent of the general population).

As for his testimony concerning rates of drug use in the Florida TANF

31

population, the district court rejected Dr. Mack's opinion, concluding that he was not sufficiently qualified by background, training, or expertise to offer the opinions he presented. The district court explained that, while Dr. Mack had authored articles and books about drug-related issues, and taught about drug-related disorders, he had never studied, surveyed, or collected any information on the TANF population in any context, much less TANF applicants in Florida. Lebron, 990 F. Supp. 2d at 1294. Indeed, there is no evidence in this record that Dr. Mack had conducted any studies about the prevalence of drug abuse among any discrete segments of the population. According to Dr. Mack's testimony, his opinion was based solely on publications from other researchers. Id. But before an expert can properly rely on appropriate studies in the field, the proponent of the expert must establish that these studies are indeed the kinds of studies an expert in the field would rely on -- and the district court did not abuse its discretion in deciding that Dr. Mack was not an expert in the relevant field. See Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").

Expertise in one field does not qualify a witness to testify about others. See Increase Minority Participation by Affirmative Change Today of Nw. Fla., Inc. v. Firestone, 893 F.2d 1189, 1192, 1195 (11th Cir. 1990) (finding no abuse of

32

discretion when a district court excluded expert testimony from a political scientist who sought to offer a statistical opinion beyond his expertise); see also Dura Auto. Sys. of Ind., Inc. v. CTS Corp., 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty."). Dr. Mack has a background in clinical psychiatry and the treatment of drug abuse, not social science or statistics. But the crux of Dr. Mack's testimony was a claim about the rates of drug use among the TANF population. A social scientist or statistician with experience in conducting surveys and parsing their results, and extrapolating conclusions about populations from limited samples of information, would be in a position to reliably draw such an inference; a clinical psychiatrist may not be. The State put forward precious little to suggest he was qualified "by knowledge, skill, experience, training, or education" to testify about rates of drug use across demographic groups, particularly among TANF applicants. Fed. R. Evid. 702. Dr. Mack admitted that he had never previously conducted any research regarding TANF or TANF in Florida and that he reached his opinion instead by relying on studies. Dr. Mack claimed no prior experience with or knowledge of drug use among Florida's TANF population. He stated that he had not examined Lebron or any member of the putative class -- all past, present, or future TANF applicants who could be subject to § 414.0652. And Dr. Mack did not claim to have any background in studying

33

the rates of drug use in any demographic group.  Dr. Mack did not "propos[e] to testify about matters growing naturally and directly out of research [he had] conducted independent of the litigation."  Fed. R. Evid. 702, Advisory Comm. Notes (2000 Amendments) (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317 (9th Cir. 1995)).  Instead, in an area that he did not otherwise specialize in, Dr. Mack "developed [his] opinions expressly for purposes of testifying."  Id.  The long and short of it is that the district court acted well within its discretion (nothing it did was manifestly erroneous) when it determined that Dr. Mack was not qualified by background, training, or expertise to opine about the degree of drug use in Florida's TANF population.

Nor did the district court abuse its considerable discretion in determining that Dr. Mack's testimony about the general effects of drug use would not assist the trier of fact.  As we've explained, the ills associated with drug use in the overall population (although well and generally understood) do not support a special need absent some particular concern about Florida TANF recipients.  The court did not manifestly err in concluding that expert testimony about the effects of drug abuse on individuals, families, and employment prospects in the general population in no way would have helped the district court as the trier of fact.

The State now argues that the underlying articles relied upon by Dr. Mack were separately admissible and provided independent support for the State's

34

argument that drug use in the TANF population exceeds rates in the general population. To weigh against summary judgment, these reports must have been admissible at trial. But with Dr. Mack excluded, the State did not put forward a qualified expert to present them. See Fed. R. Evid. 803 (permitting the admission of statements "contained in a treatise, periodical, or pamphlet" when "the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination" and when "the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice"); Dartez v. Fibreboard Corp., 765 F.2d 456, 465 (5th Cir. 1985) (admission of medical articles improper where plaintiff's medical expert did not testify about the disputed articles); Williams Island Synagogue, Inc. v. City of Aventura, 329 F. Supp. 2d 1319, 1323 (S.D. Fla. 2004) ("[L]earned treatises are inadmissible as hearsay on summary judgment where no expert witness testimony supports the proposition asserted by way of the treatise."); 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 8:102 (4th ed. 2014) ("[T]reatises must . . . be offered with expert testimony.").

Nevertheless, the State claims that the district court had the authority to take judicial notice of the articles because they contained legislative, not adjudicative facts. See Fed. R. Evid. 201, Advisory Comm. Notes (1972 Proposed Rules). But, notably, the State did not ask the district court to take judicial notice of the studies

in its summary judgment filings, nor did it argue in the district court that these studies amounted to legislative facts, nor finally did the district court take judicial notice.  Ramirez v. Sec'y, U.S. Dep't of Transp., 686 F.3d 1239, 1249 (11th Cir. 2012) ("It is well-settled that we will generally refuse to consider arguments raised for the first time on appeal.").  Even, however, if the State had properly preserved this argument (and it did not), we would review a district court's decision not to take judicial notice only for abuse of discretion.  See Lodge v. Kondaur Capital Corp., 750 F.3d 1263, 1273 (11th Cir. 2014).  On this record we can discern nothing indicating that the district court abused its ample discretion in not taking judicial notice of the studies.

Having rejected Mack's expertise, the district court was left with studies about which it could not readily determine methodological soundness or reliability, nor establish their relevance to the TANF population in Florida.  For example, almost all of the key articles cited rely on data culled from surveys, either past versions of the National Survey on Drug and Health (formerly the National Household Survey on Drug Abuse) or other regional surveys.  Significant methodological questions must be answered before the reliability of these reports can be assured, including whether surveys are a reliable method of determining rates of drug abuse in a population, whether the samples relied on are sufficiently large and unbiased, and whether the results can be extrapolated to the TANF

36

population at issue in this case.  On this record, however, we have no expert to tell us anything about these important foundational problems.

Moreover, none of the articles cited dealt specifically with the Florida TANF population, so their applicability to the case at hand is by no means self-evident. For example, as the district court noted, one of the studies involved single mothers receiving TANF benefits in Cook County, Illinois ten years ago.  Lebron, 990 F. Supp. 2d at 1294.  Another study looked at survey data from the TANF population of an unnamed California county in 2001.   Without a qualified expert to comment on the extent to which these results can be extrapolated to the population at issue in this case -- a population with a different composition, in a different place, at a different time -- the reliability and relevance of these reports cannot readily be determined.

In addition, some of these articles were referenced by the State at the preliminary injunction stage; at that early point in the proceeding, the district court found they did "not support the conclusion that drug abuse is a 'concrete danger' among the class of citizens the State seeks to drug test," Lebron, 820 F. Supp. 2d at 1287, and our prior panel opinion held that "the district court did not err in rejecting, as irrelevant or non-persuasive, the reports concerning drug use in the welfare populations." Lebron I, 710 F.3d at 1211 n.6.

Although courts of appeals may at times take judicial notice of legislative

37

facts <u>sua sponte</u>, <u>see</u> <u>Landell v. Sorrell</u>, 382 F.3d 91, 135 n.24 (2d Cir. 2004) (noting that "appellate courts take judicial notice of legislative facts under appropriate circumstances," especially on "straightforward questions" where the court does not "lack[] substantial experience or expertise"), the preceding considerations convince us that it would be inappropriate to do so here.  We are hard-pressed to ascribe significance to these studies without an appropriately credentialed expert to vet them.

3.

The district court also disregarded as inadmissible or irrelevant testimony from three lay witnesses presented by the State.  Michael Carroll and Peter Digre, both employees of DCF, submitted declarations in support of the contention that a drug problem exists in Florida's TANF population.  Carroll said that he had firsthand observed a strong correlation between drug use and employment, as well as drug use and poverty, and had observed drug use as a substantial barrier to employment for the population likely to participate in TANF.  Carroll added that he had personally observed hundreds of TANF applicants who appeared to be under the influence of drugs, and that TANF recipients are more likely to use drugs than recipients of other government benefits.  Digre said he had personally observed the harms of drug use in the TANF population, and a correlation between drug use and unemployability.  The State also presented deposition testimony from

38

Bruce Ferguson, an employee of a private, not-for-profit entity that helps individuals receiving public assistance find work. Ferguson testified in a deposition that, as part of his job, he referred individuals to a substance abuse facility when they self-identified as having a drug problem, and that forty-two clients had self-disclosed a drug or alcohol problem during a ninety-day period.

The district court found that the evidence submitted by the State from Carroll, Digre, and Ferguson was inadmissible and could not have been reduced to admissible evidence at trial. According to the court, the conclusory statements of Carroll and Digre about links between drug use and poverty or employability were incompetent as a matter of law: Carroll and Digre were not qualified as experts, and their opinions were offered without support from any relevant studies or empirical data. Moreover, Carroll's claim that he had observed TANF applicants who appeared to be under the influence of drugs was not based on any expertise in assessing drug use by observation. Lebron 990 F. Supp. 2d at 1295-96. In addition, the district court explained, even if evidence from Carroll, Digre, and Ferguson was admissible, it would not have helped the State meet its burden of establishing a substantial special need. Carroll said he had observed drug use as a problem for employment among the population "likely" to participate in TANF, but this did not help the State establish an actual drug problem within the TANF population. Id. at 1296. Similarly, the district court noted that Ferguson's

39

testimony about self-reports of drug and alcohol abuse from individuals receiving public assistance did not specify whether those who reported were TANF recipients or, indeed, whether they reported an alcohol problem, which would not affect an applicant's TANF eligibility under § 414.0652, as opposed to a drug problem. Id. We review the district court's ruling on the admissibility of lay testimony for clear abuse of discretion. See United States v. Jayyousi, 657 F.3d 1085, 1102 (11th Cir. 2011).

The district court did not abuse its discretion in rejecting the testimony of the state's lay witnesses. To be admissible, lay testimony must be (1) "rationally based on the witness's perception," (2) "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and (3) "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. This rule of evidence is designed to prevent parties from "proffering an expert in lay witness clothing" by ensuring that "testimony that is actually expert" passes the strictures of Rule 702. Id., Advisory Comm. Notes (2000 Amendments). While lay witnesses may testify about their own immediate perceptions, testimony that blurs into supposition and extrapolation crosses the line into expertise. See Williams v. Mast Biosurgery USA, Inc., 644 F.3d 1312, 1317-18 (11th Cir. 2011) (treating testimony as expert when it "is based on a hypothesis, not the experience of" the witness); United States v. Henderson, 409 F.3d 1293,

40

1300 (11th Cir. 2005) ("the ability to answer hypothetical questions is '[t]he essential difference' between expert and lay witnesses" (quoting Asplundh Mfg. Div. v. Benton Harbor Eng'g, 57 F.3d 1190, 1202 n.16 (3d Cir.1995)).

In this case, the testimony of Carroll and Digre plainly was offered to support the broad claim that there is a particularly high rate of drug use in the Florida TANF population.  This proposition is an inference well beyond what the witnesses had perceived in their day-to-day work; it is a conclusion that would require "specialized knowledge," Fed. R. Evid. 701, and must be provided by an appropriately credentialed expert witness to be admissible.  Broad statements asserting "a strong correlation" between "drug use and unemployability" and "drug use and poverty," or claiming that "TANF recipients are more likely than recipients of other government benefits to use drugs" are beyond the realm of the lay witness.  To support these claims, it seems to us that a witness would have to know, among other things, the rates of drug use, employment, and income across multiple populations and perform the sophisticated calculation of drawing correlations across these various factors.  Carroll, Digre, and Ferguson, who had no training either in identifying the victims of drug abuse or studying the Florida TANF population, were not qualified by "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, to testify on these grounds, and their anecdotal observations could not support the sweeping claims for which they were offered.

41

And, again, there is no expert to make anything of these claims.

Moreover, even if the testimony were allowable under Rule 701, nothing in the proffers from Carroll, Digre, and Ferguson support a special need for suspicionless testing. To begin with, general statements about the harms flowing from drug abuse, while undeniably true, do not inform this inquiry. Nor do their other statements demonstrate a drug problem among Florida TANF applicants greater than any problem found in the general population of Florida. First, Carroll declared that, in his more than twenty years with DCF, he had "personally observed hundreds of TANF applicants who appear to be under the influence of drugs," had "frequently observed slurred speech, bloodshot eyes, inability to focus, and other similar symptoms that indicated to me the applicants were using drugs," and in many instances had "personally detected the odor of marijuana on applicants." This anecdotal observation comes nowhere close to supporting a population-wide trend. Observation of hundreds of drug users in twenty years (or "many instances" of smelling marijuana) may be entirely consistent with the five percent drug use figure found in the Demonstration Project; again, without a qualified expert, it is impossible to extrapolate these observations into conclusions about the Florida TANF population. Further, the symptoms Carroll identifies -- slurred speech, bloodshot eyes, difficulty focusing -- could just as easily indicate alcohol intoxication, not drug use. And, again, this witness was not qualified by

42

training, background, and expertise as an expert in discerning drug use or abuse.

The statements from Digre are even less revealing; he provides no evidence that would support an inference that drug use is more prevalent among the TANF population. Finally, Ferguson's testimony that forty-two individuals receiving public assistance self-reported drug or alcohol problems says nothing about drug use in the TANF population: Ferguson did not identify which benefits programs the individuals participated in or whether drugs, and not alcohol, were behind the self reports.[5] Thus, even if taken as true, none of the evidence from Carroll, Digre, or Ferguson helped the State meet its special needs burden.[6]

The State also argues that the Supreme Court in Earls relied on anecdotal evidence to establish a special need to drug test students: teachers had seen students who appeared to be on drugs and had heard students speaking openly about drug abuse. 536 U.S. at 834-35. This argument misses the mark because

---

[5] The district court also did not abuse its discretion in determining that Ferguson's testimony was not only unhelpful to the State's argument but also inadmissible hearsay. Ferguson's testimony about the number of clients with disclosed drug or alcohol problems over a ninety day period was drawn from caseload information he had received in an e-mail from an undisclosed declarant. Since this declarant did not testify and the statement was offered for its truth, see Wright v. Farouk Sys., Inc., 701 F.3d 907, 910 (11th Cir. 2012), we conclude that the district court did not abuse its discretion in finding the statement to be hearsay.

[6] Before the district court, the State also proffered a declaration from Patricia Brown, a systems analyst employed by DCF. Brown conducted a data-matching exercise that attempted to compare rates of drug use among Florida TANF, Medicaid, and SNAP (food stamps) recipients by cross-referencing records in the DCF's files. The district court ruled that the evidence from Brown was inadmissible hearsay, and that it was irrelevant to the issue in the case because, among other reasons, it looked at rates of substance abuse and misuse, which did not differentiate alcohol from drug use. . The State does not challenge on appeal the district court's decision to exclude evidence from Brown.

43

Earls involved public school children, a group especially entrusted to the government's care and demonstrably susceptible to harm from drug use. These powerful special circumstances are not found for Florida TANF applicants. The long and short of it is that, on this summary judgment record, the State has failed to demonstrate a peculiar problem of drug abuse among Florida TANF applicants that elevates the state's concern from a general to a special interest.

Moreover, even if the State could have established that an unusual rate of drug use among TANF applicants gave rise to a special need -- and this record supports no such determination -- the § 414.0652 drug-testing program is not well designed to identify or deter applicants whose drug use will affect employability, endanger children, or drain public funds. Notably, TANF applicants are given a ten-day window in which to take and pass a drug test once the State has confirmed that they are otherwise TANF-eligible. And the clock for the whole process does not start until the application is submitted -- a step the TANF applicant plainly controls. Thus, as in Chandler, the test date "is no secret"; "users of illegal drugs, save for those prohibitively addicted, could abstain for a pretest period sufficient to avoid detection." 520 U.S. at 320.

In short, the State has not met its core burden of establishing a substantial special need justifying suspicionless drug testing. The State has not shown elevated rates of drug use among TANF applicants. The State's asserted interests

44

in promoting work, protecting families, and saving public money are stated only at the highest order of generality and are all-inclusive.  In cases involving surpassing safety threats or public school students, the Supreme Court has carefully cordoned off a category reserved for exceptional circumstances.  If the general government concerns raised in this case sufficed for special needs, the Supreme Court in Skinner, Von Raab, Vernonia, Earls, and Chandler spilled much ink in vain.

### B.

Alternatively, the State argues, even if its suspicionless drug-testing regime otherwise would run afoul of the Fourth Amendment, all constitutional concerns are cured by the consent of TANF applicants because "a search conducted pursuant to a valid consent is constitutionally permissible." Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).  After all, TANF is a voluntary program.  Applicants must sign a form consenting to the drug test and must follow through with the screening themselves.  Lebron responds that, when "the State attempts to justify a search on the basis of . . . consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." Id. at 248.  The law of this case, and Eleventh Circuit precedent, lead us to reject the consent argument.  Moreover, treating consent as a separate and dispositive inquiry -- rather than a component of the broader special-needs balancing test -- is not consonant with the Supreme

45

Court's approach to evaluating suspicionless drug-testing programs.

In Lebron I, the Court rejected the State's argument that "the mandatory 'consent,' which Florida's drug-testing statute makes a condition to the receipt of benefits, is of any constitutional significance." 710 F.3d at 1214. The panel opinion explained that consent is invalid if it is "granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right." Id. (quoting Johnson v. United States, 333 U.S. 10, 13 (1948)). It concluded that, by conditioning TANF benefits on drug testing, "the State conveys a message that it has the unfettered lawful authority to require such drug testing -- period." Id. at 1215. We also concluded that, because Florida cannot conduct suspicionless drug tests of TANF applicants directly, "it cannot do so indirectly by conditioning the receipt of this government benefit on the applicant's forced waiver of his Fourth Amendment right." Id. at 1217. After all, government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." Perry, 408 U.S. at 597; accord Regan v. Taxation with Representation of Wash., 461 U.S. 540, 545 (1983) ("[T]he government may not deny a benefit to a person because he exercises a constitutional right."); see Speiser v. Randall, 357 U.S. 513, 519 (1958) (striking down a state tax exemption denied to claimants who advocated overthrow of the government as unconstitutionally restricting freedom of speech). Under the law of the case doctrine, we are bound to the legal conclusion that the TANF

program's mandatory consent does not ensure the search is reasonable under the Fourth Amendment. There is no indication that the law has changed since Lebron I was decided or that any of the substantive evidence considered by the district court altered this conclusion.

Indeed, subsequent Eleventh Circuit law has echoed the conclusion reached in Lebron I. In AFSCME, Florida argued that mandatory drug testing of public employees was reasonable because employees consented to the testing rather than lose their jobs. As we explained, "[i]n effect, the State is offering its employees this Hobson's choice: either they relinquish their Fourth Amendment rights and produce a urine sample which carries the potential for termination, or they accept termination immediately." AFSCME, 717 F.3d at 873. We were not persuaded by the argument because employees' submission to drug testing on pain of termination did not constitute consent under governing Supreme Court law. Id. at 873-74.

Again, no new material facts have emerged in the summary judgment record that alter the outcome under the legal principles laid out in Lebron I, or, for that matter, in AFSCME. The State says that deposition testimony from Lebron indicates that he freely signed the consent form and knew he could refuse the drug test, albeit at the expense of his TANF eligibility. This fact does not affect the result because "[s]urrendering to drug testing in order to remain eligible for a

47

government benefit such as employment or welfare, whatever else it is, is not the type of consent that automatically renders a search reasonable as a matter of law." AFSCME, 717 F.3d at 875.

We also see no merit to the State's argument that two recent Supreme Court decisions regarding unconstitutional conditions abrogated our holding in Lebron I, or altered the conclusion drawn in AFSCME, concerning consent.  Neither case called into question, much less clearly overruled, our earlier decisions -- instead, both cases involved significantly different constitutional rights and both held that government conditions were unconstitutional.  See NLRB v. Datapoint Corp., 642 F.2d 123, 129 (5th Cir. Apr. 1981) ("Without a clearly contrary opinion of the Supreme Court or of this court sitting en banc, we cannot overrule a decision of a prior panel of this court.").[7]

In Agency for International Development v. Alliance for Open Society International, Inc. (AID), 133 S. Ct. 2321, 2324 (2013), the Supreme Court addressed a condition in a federal foreign aid grant program requiring that nongovernment organizations have an explicit policy opposing prostitution and sex trafficking in order to receive funds to fight the global spread of HIV and AIDS. The Court held that the condition violated recipients' freedom of speech by compelling them to "adopt a particular belief as a condition of funding." Id. at

---

[7] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding all Fifth Circuit precedent handed down before October 1, 1981.

48

2330.  In so doing, the Court explained that in the First Amendment context funding conditions can be acceptable when they "define the limits of the government spending program," but are impermissible when they "seek to leverage funding to regulate speech outside the contours of the program itself." Id. at 2328. This case provides little help for the State.  It arises in the context of the First Amendment, and in no way involved suspicionless drug testing; therefore the Court had no occasion to consider the special needs doctrine.  Moreover, the Court noted that, in the First Amendment context, the recipient's mere "recourse . . . to decline the funds" does not cure any funding condition of constitutional infirmity. Id. at 2329.

Next, in Koontz v. St. Johns River Water Management District, 133 S. Ct. 2586, 2595 (2013), a property takings case, the Court applied its decades-old doctrine that the government can "condition approval of a [building] permit on the dedication of property to the public so long as there is a 'nexus' and 'rough proportionality' between the property that the government demands and the social costs of the applicant's proposal" (quoting Dolan, 512 U.S. at 391 and Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 837 (1987)).  This case is equally unavailing. The Court recognized that takings cases "involve a special application" of the unconstitutional conditions doctrine, id. at 2594 (quoting Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 547 (2005)), far afield from the Fourth Amendment

49

considerations at issue here.  What's more, the Court reaffirmed that "the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them."  Id. at 2595.  These decisions in no way upset our construction of consent as framed in Lebron I, or, for that matter, in AFSCME.[8]

Moreover, we need not ask separately whether consent to a suspicionless drug test was valid when conditioned on receipt of a government benefit because, in this case, the unconstitutional conditions inquiry is baked into the special needs analysis.  Under the analytical framework laid out in Lebron I, and, indeed, in AFSCME, when the government conducts suspicionless drug testing, consent exacted as a condition of receiving a benefit is a factor in the special needs analysis, not an alternative path around Fourth Amendment requirements.  See AFSCME, 717 F.3d at 874 ("[C]onsent has already been adequately incorporated into the special-needs balancing test, which obliges us to evaluate whether an employee's choice of profession necessarily diminishes her expectation of privacy.");  see also Vernonia, 515 U.S. at 657 ("By choosing to 'go out for the

---

[8] We also see no merit to the State's argument that Lebron I or AFSCME were affected by United States v. Yeary, 740 F.3d 569 (11th Cir. 2014).  In Yeary, a criminal defendant who had made specific threats to kill his girlfriend consented to warrantless entries and searches of his home to ensure he did not engage in illegal activity as a condition of pre-trial release, to which he had no entitlement.  Id. at 580-83.  A majority of the Yeary panel held that the consent was valid to justify a search of the defendant's home.  Id. at 583.  This case from the criminal context hardly calls into question our holdings concerning the validity of consent to suspicionless drug testing from TANF applicants in Lebron I or government employees in AFSCME.

50

team,' [student athletes] voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally."); Von Raab, 489 U.S. at 671 (finding that employees' choice of "certain forms of public employment may diminish privacy expectations even with respect to . . . personal searches"); Ferguson v. City of Charleston, 532 U.S. 67, 91 (2001) (Kennedy, J., concurring in the judgment) ("[C]onsent, and the circumstances in which it was given, bear upon the reasonableness of the whole special needs program.").

Treating consent as a separate and dispositive inquiry would eviscerate the Supreme Court's carefully delineated special needs analysis in drug testing cases. After all, special needs balancing accounts for whether consent reduces an individual's legitimate expectation of privacy. Tellingly, the drug-testing programs in Skinner, Von Raab, Vernonia, Chandler, and Earls all required consent, but the Supreme Court each time applied the same special needs reasonableness analysis: "the Supreme Court has never held that such drug testing regimes were constitutionally reasonable because of consent." Lebron I, 710 F.3d at 1215. Allowing a government program that plainly fails the special needs balancing test to move forward solely on the basis of extracted consent would effect an end-run around the Supreme Court's well-established approach to

suspicionless drug-testing cases.[9]  Consent to such a search is surely relevant, but it should be considered "through the prism of . . . special-needs balancing." AFSCME, 717 F.3d at 875.

Our conclusion is consistent with the decisions of our sister circuit courts of appeal, which "have also applied the special-needs balancing test, rather than treating consent as the sole determinant of a policy's constitutionality, in cases where the government attempted to compel consent to drug testing as a condition for obtaining some privilege."  AFSCME, 717 F.3d at 876 (citing Joy v. Penn-Harris-Madison Sch. Corp., 212 F.3d 1052, 1055, 1067 (7th Cir. 2000)); see also,

---

[9] In a footnote in its blue brief, and again at oral argument, the State cited Ferguson v. City of Charleston, 532 U.S. 67 (2001), for the proposition that consent is an independent inquiry from the special needs analysis.  In that case, a public hospital adopted a policy to drug test urine samples from maternity patients and relay the results to law enforcement.  Id. at 70-73.  The Supreme Court held that the program was not justified under the special needs doctrine because "the immediate objective of the searches was to generate evidence for law enforcement purposes."  Id. at 83.  However, the Court remanded for the lower court to determine whether "the searches were conducted with[] the informed consent of the patients."  Id. at 76.  The State argues that such a remand would have been unnecessary if consent were not a dispositive factor independent of the special needs analysis.  We are unpersuaded.  First, as Justice Kennedy noted in his Ferguson concurrence, the lower court's subsequent finding on consent could have been relevant as a factor that "[bore] upon the reasonableness of the whole special needs program," rather than as a separate and dispositive inquiry.  Id. at 91 (Kennedy, J., concurring in the judgment).  Moreover, the circumstances of this case are quite different.  Ferguson, like most Fourth Amendment cases, involved government searches carried out for law enforcement purposes.  A long line of Supreme Court caselaw establishes that the constitutional infirmities of such searches can be cured by an individual's consent.  See, e.g., Fernandez v. California, 134 S. Ct. 1126, 1132 (2014); Schneckloth, 412 U.S. at 219; Davis v. United States, 328 U.S. 582, 593-94 (1946).  By contrast, in this case, as in the Supreme Court's more specific line of special needs cases, suspicionless drug testing is used not for law enforcement but "to disqualify [an applicant] from eligibility for a particular benefit."  Ferguson, 532 U.S. at 78.  As noted above, the Supreme Court's approach to these cases has made clear that while consent is an important component of the special needs analysis, it is not a standalone trump card.

52

e.g., Miller v. Wilkes, 172 F.3d 574, 576, 577-82 (8th Cir. 1999) (upholding a school drug testing program after a full special needs analysis and not treating the existence of consent forms as dispositive), vacated as moot, 172 F.3d at 582. "Simply put, we have no reason to conclude that the constitutional validity of a mandated drug testing regime is satisfied by the fact that a state requires the affected population to 'consent' to the testing in order to gain access or retain a desired benefit." Lebron I, 710 F.3d at 1215.[10]

In the final analysis, the warrantless, suspicionless urinalysis drug testing of every Florida TANF applicant as a mandatory requirement for receiving

---

[10] Because, as we see it, the consent inquiry is included within the special needs analysis here, the State's reliance on unconstitutional conditions cases that arose in different contexts seems misplaced. In Rust v. Sullivan, 500 U.S. 173 (1991), the Supreme Court upheld regulations prohibiting recipients of federal family planning funds from engaging in abortion-related activities. But Rust distinguished other unconstitutional conditions cases by holding that the government abortion restrictions did not deny anyone a benefit, id. at 196; in this case, of course, Lebron was denied TANF cash benefits when he exercised his constitutional right. Lebron I, 710 F.3d at 1220 (Jordan, J., concurring). In Wyman v. James, 400 U.S. 309 (1971), the Supreme Court held that state welfare workers could make home visits a mandatory condition of receiving Aid to Families with Dependent Children benefits. As we explained in Lebron I, though, the Supreme Court ruled that the visit did not amount to a search, and thus "never reached the question of whether, and under what conditions, a mandatory 'consent' could render an actual Fourth Amendment search reasonable." 710 F.3d at 1216; see id. at 1216 n.10 ("Wyman is further distinguishable as it was decided outside the context of drug testing and the Supreme Court has well-established precedent that governs the reasonableness of drug testing in the event a court is called upon to balance the competing government and individual privacy interests."). By contrast, there is no question that submitting a urine sample is a search. See Skinner, 489 U.S. at 617. Moreover, the nature of the intrusion involved in this case is of a different order. The State here goes beyond a home visit; as the district court noted at the preliminary injunction stage, the drug testing involved here "necessarily entails intrusion into a highly personal and private bodily function, and the subsequent urinalysis . . . can reveal a host of private medical facts about the individual." Lebron, 820 F. Supp. 2d at 1283. Finally, Wyman was decided over a decade before Skinner set forth the special needs doctrine for Fourth Amendment intrusions, so the Wyman Court had no opportunity to engage in the calculus we make today.

Temporary Cash Assistance offends the Fourth Amendment. On this record, the State has not demonstrated a substantial special need to carry out the suspicionless search -- we see no concrete danger, only generalized public interests. And the State cannot use consent of the kind exacted here -- where it is made a condition of receiving government benefits -- to wholly replace the special needs balancing analysis. We respect the State's overarching and laudable desire to promote work, protect families, and conserve resources. But, above all else, we must enforce the Constitution and the limits it places on government. If we are to give meaning to the Fourth Amendment's prohibition on blanket government searches, we must -- and we do -- hold that § 414.0652 crosses the constitutional line.

**AFFIRMED.**